UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

----oo0oo----

| | |
|---|---|
| INSPECTION MANAGEMENT SYSTEMS, INC.,<br><br>　　　　Plaintiff,<br><br>　v.<br><br>OPEN DOOR INSPECTIONS, INC., MICHAEL R. SCHEIDERICH; KEVIN SCHEIDERICH; BOB FISHER; RUN TANGENT, LLC,<br><br>　　　　Defendants. | No. 2:09-cv-00023-MCE-GGH<br><br><br><br>**MEMORANDUM AND ORDER** |

Through the present lawsuit, Plaintiff Inspection Management Systems, Inc. ("Plaintiff" or "IMS") seeks to prevent Defendants from marketing their software program for managing home inspections, on grounds that said program is unlawfully derived from software previously developed by IMS. IMS claims that Defendant Scheiderich subscribed to the IMS software and violated the contractual conditions of its use by making the software available to engineers in India for purposes of developing a competing product. IMS' initial request for a TRO was granted by the Court on January 16, 2009.

1

Because the initial date set for the hearing on Plaintiff's subsequent request for a preliminary injunction fell outside the time parameters for permitting injunctive relief to remain in place, the TRO expired. As set forth below, Plaintiff's Motion for a Preliminary Injunction will now be denied.

**BACKGROUND**

According to Plaintiff's First Amended Complaint, IMS has developed unique scheduling, management, and business automation software that allows home inspectors to automate key business processes. First Amended Complaint ("FAC"), ¶ 5. In February of 2007, Defendant Michael Scheiderich registered as a user of the IMS software, and according to the FAC, he simultaneously executed an electronic End User Licensing Agreement ("EULA") as part of his user registration process.[1] Under the terms of the EULA (a copy of which is attached to the FAC as Exhibit "A") a non-transferable license to use the IMS software was granted. The user also acknowledged IMS' exclusive proprietary rights in the system and agreed not to disclose any information, for a period of three years after accepting the EULA, to any person who has not also accepted the EULA. See EULA, Ex. "A" to Pl.'s FAC, ¶¶ 13, 18, 21. Paragraph 21(b) of the EULA contains the following stipulation:

///

---

[1] Michael Scheiderich, for his part, does not recall ever having accepted the terms of the EULA as a precondition to using the IMS software, or signing a hard copy of the agreement. Michael Scheiderich Decl., ¶ 6.

2

> "You agree that the information being provided by IMS, Inc. is confidential and derives its value, in part, from its confidential nonpublic nature. You further agree that in the event you breach this agreement, IMS, Inc., will suffer irreparable harm."

Id. at ¶ 21(b).

The FAC goes on to allege that on October 1, 2008, individuals both using Michael Scheiderich's IMS logon simultaneously accessed the IMS software from Georgia (where Scheiderich allegedly resided) and from India. Both users thereafter remained online utilizing the IMS program for approximately one hour. FAC, ¶¶ 14-15.

IMS contends that the simultaneous logon was orchestrated so that software engineers in India could emulate its software. IMS bases its contention in this regard on the fact that in November of 2008, IMS' President, Russell Colliau, attended a sales demonstration made by Michael Scheiderich to market new home inspection software called "Inspector Accelerator". That software was developed under the auspices of a new company established for that purpose, Defendant Run Tangent, LLC. During Scheiderich's sales demonstration, Colliau allegedly observed visual elements similar to those contained within the IMS software. This caused him to conclude that Defendants had both illegally copied portions of the IMS code and incorporated those copied portions into their own server code. See January 13, 2009 Colliau Decl., ¶¶ 31-32.

///
///
///
///

In support of that inference, Colliau cited both the similarities he observed in the software and the close relationship in time between the simultaneous logons to the IMS program, as delineated above, and the demonstration of Defendants' software thereafter. Id. In a subsequent February 12, 2009 Declaration, Colliau elaborated further on just what similarities he observed:

> Many elements of the Inspector Accelerator program, including visual elements, specialized business processes and the handling of the relationships between the realtors, clients and home inspector were extremely similar to unique elements of the IMS system.

February 12, 2009 Colliau Decl., ¶ 11.

Based on the initial evidence provided by IMS, along with its claim that Defendants intended a launch of their new, allegedly infringing software, at a national home inspectors trade show to be held in Florida between January 21, 2009 and January 25, 2009, the Court granted IMS' initial request for a temporary restraining order on January 16, 2009 in order to protect against the threat of irreparable harm pending a more thorough review of the claims made by IMS.

In opposition to Plaintiff's request for preliminary injunctive relief, Defendants claim that IMS has submitted little more than innuendo and speculation to support its claims of Defendants' alleged wrongdoing. Scheiderich claims that the November 2008 sales presentation apparently attended by Colliau in fact showed only a very limited view of the Inspector Accelerator system, with only a few screen shots and without filling in any of the fields or showing any of the actual processes in the system. Michael Scheiderich Supp. Decl., ¶ 8.

4

Factually, Defendants deny that they copied the IMS software in any way in developing their own home inspection software.[2] Although Defendants admit that the software was developed by software engineers based in India, they claim that its design was not copied based on any access to the code, screens or elements of the IMS system.[3] Michael Scheiderich Decl., ¶ 12; Kevin Scheiderich Decl, ¶¶ 5-7; Chetan Kelkar Decl., ¶ 2(a). Defendants point to the fact that because the IMS software is web based, a user like Scheiderich lacked access to either the source or object codes underlying the IMS system. Michael Scheiderich Decl., ¶ 5. According to Defendants, one of its Indian software developers, CSSA Global, viewed the IMS system only in order to understand the need for agents to be linked to multiple inspections on behalf of their clients. Scheiderich Decl. at ¶ 12; Kelkar Decl. at ¶ 4.

Functionally, Defendants also claim that Inspector Accelerator system is structured as a client-based system, where clients, agents and others each have their own database profile. Michael Scheiderich Decl., ¶ 20a. In contrast, they describe the IMS system as parameter based, meaning that all records are tied to the inspection or service event. Id.

---

[2] Defendants assert that Open Door Inspections is Michael Scheiderich's home inspections business company and was not involved in any way in the development or marketing or Inspector Accelerator software. Instead, Schederich claims he formed Run Tangent, LLC for that purpose. Michael Scheiderich Decl., ¶¶ 9, 10.

[3] According to the Declaration of Kevin Scheiderich, two Indian software developers spent in excess of 1500 hours in creating the basic database and overall architecture for the Inspector Accelerator software, which included both a "lite" and a professional version. Kevin Scheiderich Decl., ¶¶ 3-7.

5

While IMS disputes that description, and claims that the IMS system is in fact client based, its own copyright application appears to belie that contention in describing that IMS system as a "parameter based appointment scheduling system and method". See Ex. E to Scheiderich Decl.

Given the fact that Plaintiff's copyright application is still pending, Plaintiff's First Amended Complaint deletes the copyright and trademark infringement claims included within the original complaint. IMS continues to assert a claim for breach of contract, given IMS' claim that Schederich breached the terms of his EULA in emulating the IMS software. Moreover, the FAC also asserts counts alleging misappropriation of trade secrets and claims for unfair business practices and false advertising under California law.

**STANDARD**

A preliminary injunction is an extraordinary remedy, and Plaintiffs have the burden of proving the propriety of such a remedy by clear and convincing evidence. See Granny Goose Foods, Inc. v. Teamsters, 415 U.S. 423, 442 (1974). In order to warrant issuance of such relief, Plaintiffs must demonstrate either: 1) a combination of probable success on the merits and a likelihood of irreparable injury; or 2) that serious questions are raised and the balance of hardships tips sharply in favor of granting the requested injunction.
///
///

Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush & Co., Inc., 240 F.3d 832, 839-40 (9th Cir. 2001); Winter v. Natural Resources Defense Council, 129 S. Ct. 365, 375 (2008) (likelihood rather than possibility of irreparable harm required for issuance of preliminary injunctive relief). These two alternatives represent two points on a sliding scale, pursuant to which the required degree of irreparable harm increases or decreases in inverse correlation to the probability of success on the merits. Roe v. Anderson, 134 F.3d 1400, 1402 (9th Cir. 1998); United States v. Nutri-cology, Inc., 982 F.2d 394, 396 (9th Cir. 1992). Under either formulation of the test for granting injunctive relief, however, Plaintiffs must demonstrate a significant threat of irreparable injury. Oakland Tribune, Inc. v. Chronicle Publ. Co., 762 F.2d 1374, 1376 (9th Cir. 1985).

**ANALYSIS**

Courts have consistently identified a showing of likely irreparable harm as the single most important prerequisite for the issuance of a preliminary injunction; Plaintiff must make that showing before the other requirement for the issuance of a preliminary injunction need even be considered. Dominion Video Satellite, Inc. v. Echostar Satellite Corp., 356 F.3d 1256, 1260-61 (10th Cir. 2004) (and cases cited therein).

///
///
///
///

7

Just what constitutes irreparable harm does not readily lend itself to precise definition. <u>Prairie Bank of Potawatomi Indians v. Pierce</u>, 253 F.3d 1234, 1246 (10th Cir. 2001). Irreparable injury has been equated with circumstances where compensatory damages are unsuitable (<u>Wildmon v. Berwick Universal Pictures</u>, 983 F.2d 21, 24 (5th Cir. 1992)), and has also been defined in terms of harm that cannot be remedied by the court following a final determination on the merits. <u>Am. Hosp. Ass'n v. Harris</u>, 625 F.2d 1328, 1331 (7th Cir. 1998). Perhaps most generally, irreparable harm is injury that cannot be adequately remedied by the imposition of money damages. <u>Prairie Band</u>, 253 F.3d at 1250.

Here, Plaintiff has produced no evidence that monetary damages are insufficient to remedy any actionable infringing conduct on the part of Defendants in violation of the EULA or otherwise. Plaintiff has cited authority for the proposition that loss of prospective customers or goodwill under some circumstances can support a finding of irreparable harm. <u>See</u> <u>Stuhlbarg</u>, 240 F.3d at 841. They also argue that loss of current or future market share may also suffice to establish the requisite harm. <u>Grand River Enterprise Six Nations, Ltd. v. Pryor</u>, 48 F.3d. 60, 67 (2d Cir. 2007). IMS cites no specific evidence, however, to support these claims. Plaintiff does not contest Defendants' claim that it has some 300 customers, IMS itself estimates its average revenue per customer at $141.40 per month. <u>See</u> Reply, p. 3; February 12, 2009 Colliau Decl., ¶ 3. There is no indication that injuries to such a customer base cannot be remedied by monetary damages.

///

Significantly, Defendants, in opposition to IMS' request for preliminary injunctive relief, indicate that there are over 25 home inspection software suites available on the market, and that IMS' total market share is negligible. Michael Scheiderich Decl., ¶ 17. Defendants also dispute the uniqueness of IMS' home inspection software and tout the differences between that software and Inspector Accelerator. The position of the respective parties on those issues remains in stark contrast and dispute.

Plaintiff's reply is telling because, when confronted with the complete lack of evidence supporting irreparable harm in this case, it falls back on the provisions of the EULA in arguing that irreparable harm is present because the parties agreed it was under the provisions of that agreement. See Reply, 2:7-11, 6:10-15 (preliminary injunction should issue because the parties contractually agreed in the EULA that its breach would constitute irreparable harm). Plaintiff's counsel also underscored that position in oral argument on this matter.

Plaintiff cannot rely on the contractual provisions of the EULA to show irreparable harm. Instead, the court must make an independent determination of whether such harm is present. As the Second Circuit stated in Baker's Aid. v. Hussmann Foodservice Co., 830 F.2d 13, 16 (2d Cir. 1987), "contractual language declaring money damages inadequate in the event of a breach does not control the question of whether preliminary injunctive relief is appropriate." The Tenth Circuit expounded on this principle in Dominion Video Satellite, Inc. v. Echostar Satellite Corp., supra.

In that case, like the case at bar, the terms of an agreement between the parties provided that its breach would cause irreparable harm. The district court's decision to grant preliminary injunctive relief rested primarily on that contractual language in determining that the requisite irreparable harm was present. Dominion Video Satellite, 356 F.3d at 1261. The Tenth Circuit reversed, explaining that irreparable harm should not automatically be assumed from such an agreement. The court instead explained that courts must "examine whether the harms alleged by the party seeking the preliminary injunction are in fact irreparable, and noted that even in the face of such agreements courts "sometimes conclude in the negative." Id. at "1263.

The Ninth Circuit has also adopted this reasoning, albeit in an unpublished decision. In Int'l Ass'n of Plumbing and Mechanical Officials v. Int'l Conf. of Building Officials, 1996 WL 117447 (9th Cir. 1995), the district court based its finding of irreparable injury solely on a contractual provision in which the parties conceded that irreparable injury would occur in the event of a breach. Id. at *2. The Ninth Circuit reversed, stating that it believed such conclusion was in error because it knew of no "authority which allows a petitioner seeking injunctive relief to meet its burden on the issue of irreparable injury *solely* by referring to such a contractual provision." Id. (emphasis in original).

///
///
///

It follows that IMS' reliance on the contractual language here for establishing irreparable injury is misplaced. Because the Court does not believe that IMS has otherwise met its burden in establishing irreparable injury, that prerequisite for injunctive relief is lacking and a preliminary injunction cannot issue.

While the Court need not analyze the other requirements for injunctive relief in the absence of irreparable harm, it does note that Plaintiff also appears to have failed in meeting its burden in showing probable success on the merits. The evidence that Defendants have copied portions of the IMS software amounts to little more than speculation at this point,[4] particularly in the face of evidence offered by Defendants that it revealed relatively little of its system's attributes at the time of the November 2008 sales demonstration attended by Russell Colliau. Although the simultaneous logons from India and Georgia to access the IMS program remain troubling, Defendants have provided an explanation for that access that Plaintiff again cannot squarely dismiss, especially since Defendants have also produced unrebutted evidence that as a web based system, the design and underlying code of the IMS program cannot be copied simply by logging onto the system. See Michael Scheiderich Decl., ¶ 5.

---

[4] The Court recognizes that Defendants have filed extensive evidentiary objections to the Declaration of Russell Colliau filed along with Plaintiff's original papers requesting a temporary restraining order and preliminary injunction. Because the Court's decision in this matter rests on Plaintiff's failure to establish the requisite irreparable harm for issuing a preliminary injunction, even after taking the contents of the Colliau declaration into account, the evidence fails irrespective of whether or not it is properly admissible. As such, the Court need not specifically rule on the proffered objections at this time, and declines to do so.

11

**CONCLUSION**

Based on the foregoing, Plaintiff's Motion for a Preliminary Injunction is hereby DENIED. The Court, therefore, declines Defendants' request to set a briefing schedule for purposes of levying on the bond posted by Plaintiff prior to issuance of the temporary restraining order.

IT IS SO ORDERED.

Dated: March 26, 2009

_____
MORRISON C. ENGLAND, JR.
UNITED STATES DISTRICT JUDGE